IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>JAVIER BRAVO-ORTEGA and<br>MICHAEL ANTHONY GARCIA,<br><br>Defendants. | **MEMORANDUM DECISION AND<br>ORDER DENYING DEFENDANTS'<br>MOTIONS TO SUPPRESS**<br><br><br><br><br>Case No. 2:07-CR-573<br>Dee Benson |

This matter is before the court on defendants' motions to suppress.  (Dkt. Nos. 11 & 20.)

On January 11, 2008, the court conducted an evidentiary hearing on the motions.  Defendant

Javier Bravo-Ortega was present with his counsel, Benjamin A. Hamilton.  Defendant Michael

Anthony Garcia was present with his counsel, G. Fred Metos.  The government was represented

by Mark K. Vincent.  Following the hearing, the court ordered a transcript and set a briefing

schedule.  At the parties' request, the court heard oral argument on the issues raised in the briefs

on July 3, 2008.  At the conclusion of oral argument, the court asked counsel to file supplemental

briefs on specific issues raised by the court.  After receipt of the parties' supplemental briefs, the

court again heard oral argument on September 11, 2008.  After thorough review and

consideration of the briefs submitted by the parties, the testimony presented at the evidentiary hearing, and the oral arguments presented by counsel, the court enters the following memorandum decision and order.

## FACTUAL BACKGROUND

The court finds the relevant facts as follows.[1]  On the afternoon of February 6, 2007, Utah Highway Patrol Trooper Nick Bowles was on duty on Interstate 70 near Salina, Utah.  He was located in the center median, monitoring eastbound traffic near milepost 57.  (Tr. at 14-15, 42.)  The speed limit was 75 miles per hour and the road was dry with light traffic.  The weather was partly cloudy with visibility down the highway at approximately one-half mile.  (Tr. at 15-16.)

At approximately 5:19 p.m., Trooper Bowles observed two east-bound vehicles that appeared to be traveling together.[2]  Trooper Bowles testified that he believed the vehicles were traveling together because, among other things, they were driving in very close proximity and "there was not any other traffic around."  (Tr. at 17, 43.)  The first vehicle was a Dodge Durango with Colorado license plates and an unaccompanied male driver who appeared to be in his mid-

---

[1]Reference to the transcript of the evidentiary hearing conducted on January 11, 2008, will be cited as "Tr. at ___."

[2]Counsel for Mr. Bravo-Ortega argues that Trooper Bowles lacks credibility and therefore the court "cannot reasonably rely on [his] testimony."  Def. Bravo-Ortega's Mem. In Supp. at 7, 9.  The court recognizes that there are discrepancies between the testimony and the dispatch logs, as well as a lack of synchronization between the timing devices on the video recordings from Trooper Bowles and Trooper Wright's patrol cars.  However, after thorough review of all of the evidence in this case, including consideration of the two separate video recordings and the demeanor of the witnesses at the evidentiary hearing, the court finds that both Trooper Bowles and Trooper Wright are credible witnesses.

twenties.  The second vehicle was a Buick sedan.  It also had Colorado license plates and an

unaccompanied male driver, who also appeared to be in his mid-twenties.  (Tr. at 17, 42-43.)

According to Trooper Bowles, the Buick was traveling approximately one car length behind the

Durango.  Trooper Bowles testified that Utah law prohibits following at an unsafe distance.  (Tr.

at 17, 43.)

      Having observed the vehicles traveling so closely together, Trooper Bowles pulled out of

the median in an attempt to catch up with them.  (Tr. at 17.)  Trooper Bowles testified that during

the time it took him to catch up with the vehicles, the Buick had "really increased its distance

from the Durango," and the space between the vehicles had changed from one car length to

approximately 100 yards.  (Tr. at 17, 56.)  Upon catching up with the vehicles, Trooper Bowles

also noticed that the Buick had very dark window tint in violation of Utah Code Ann. § 41-6a-

1635(1)(b).  (Tr. at 17-18, 45.)

      <u>The Stop, Detention and Arrest of Defendant Bravo-Ortega</u>

      Trooper Bowles passed the Buick and continued trying to catch up with the Durango.

While doing so, he observed the Durango, which was traveling in the right lane, cross over the

center line a "couple of inches" into the left lane and then move back into the right lane.  (Tr. at

18, 47.)  According to Trooper Bowles, it was not just the outside of the tire that crossed the line,

but rather the "entire tire" crossed over the "whole line" by a couple of inches.  (Tr. at 48.)

      While catching up with the Durango, Trooper Bowles saw Utah Highway Patrol Trooper

Kevin Wright in his patrol car in the median at milepost 59.  Trooper Bowles called Trooper

Wright and told him that he thought the Buick and Durango might be traveling together, and he

asked Trooper Wright to stop the Buick for a window tint violation.  (Tr. at 18.)

Trooper Bowles continued to follow the Durango until he was close enough to read the license plate.  Trooper Bowles positioned himself in the left lane, approximately ten feet behind the Durango, which was traveling in the right lane.  Trooper Bowles testified that once he caught up with the Durango and read the license plate, he relayed the information to dispatch and then "backed off a little bit" so he was "not pressuring the vehicle."  (Tr. at 18, 50.)

While waiting for dispatch to respond, Trooper Bowles continued following the Durango during which time he observed the Durango cross the center line two more times in violation of Utah Code Ann. § 41-6a-710(1).  (Tr. at 18, 48.)  Trooper Bowles testified that, in total, he observed the Durango cross the center line three times within approximately one-half mile.  (Tr. at 51.)  Shortly thereafter, dispatch responded with information that the vehicle was registered and owned by a rental company.  At this point, Trooper Bowles initiated a traffic stop of the Durango for failure to maintain proper lane travel.  (Tr. at 50.)

The driver of the Durango, followed by Trooper Bowles, pulled over to the right-hand side of the highway, near milepost 60.  (Tr. at 19.)  As the vehicles were stopping, Trooper Bowles saw the Buick pass them followed a few seconds later by Trooper Wright.  (Tr. at 19, 49.)

Trooper Bowles proceeded to contact the Durango's driver.  As he approached the vehicle, Trooper Bowles noticed that both of the front windows were rolled down although they had not been rolled down when the Durango initially passed him on the Interstate.  (Tr. at 24.)  Trooper Bowles also noticed two duffle bags on the second-row seat of the vehicle, and both

4

appeared to have contents. (Tr. at 24.) Trooper Bowles spoke with the driver and asked him to produce his driver's license. The driver, who spoke English, responded that he had lost his wallet in Las Vegas. (Tr. at 24.) This immediately concerned Trooper Bowles because, in his experience, when someone claims to have lost his driver's license he usually has a suspended license or outstanding arrest warrants. (Tr. at 24-25.) Because the driver did not have a license or any identification, Trooper Bowles asked him to write down his name and date of birth. The driver of the Durango was identified as Mr. Bravo-Ortega.

At Trooper Bowles request, Mr. Bravo-Ortega produced a rental agreement for the vehicle. The rental agreement indicated that the vehicle had been rented in the name of a female, who was not present, and it explicitly provided "no additional drivers." Mr. Bravo-Ortega told Trooper Bowles that his wife had rented the vehicle, however, the address listed on the rental contract was not the same address provided by Mr. Bravo-Ortega. (Tr. at 25.) Additionally, the rental agreement revealed that the vehicle had been rented in Denver, Colorado on February 4, 2007, at 10:15 p.m., suggesting that Mr. Bravo-Ortega had departed from Denver, driven to Las Vegas, and was on his way back in fewer than 48 hours. (Tr. at 26-27.) According to Trooper Bowles' calculations, Mr. Bravo-Ortega could have spent only one night in Las Vegas.

Trooper Bowles informed Mr. Bravo-Ortega that under these conditions the rental company may want the vehicle impounded. Mr. Bravo-Ortega responded by asking if he could "drive [the vehicle] to a hotel first." (Tr. at 27.) This concerned Trooper Bowles because he had never had such a request before and it seemed to him that the driver "wanted to get something out of the vehicle pretty bad before it was towed." (Tr. at 27.)

Because Mr. Bravo-Ortega did not have his driver's license or any identification, Trooper Bowles asked Mr. Bravo-Ortega to accompany him to his patrol car so he could get the information he needed to issue a warning citation.  (Tr. at 28.)  From his patrol car, Trooper Bowles relayed Mr. Bravo-Ortega's information to dispatch to run a warrants check and verify his driver's license.  Trooper Bowles then began drafting a warning citation for the improper lane travel.

While drafting the warning and waiting for dispatch to respond, Trooper Bowles asked Mr. Bravo-Ortega about his travel plans.  Mr. Bravo-Ortega said that he had departed from Denver and traveled to Las Vegas for about two days to visit his cousin who recently had a baby.  (Tr. at 29.)  When Trooper Bowles asked for the baby's name, Mr. Bravo-Ortega said he did not know, nor did he know the baby's gender.  (Tr. at 29.)  Similarly, Mr. Bravo-Ortega could not provide his cousin's address in Las Vegas, but said it was "somewhere on Tropicana."  (Tr. at 29.)  Trooper Bowles testified that whenever he asked Mr. Bravo-Ortega about his travel plans Mr. Bravo-Ortega would "fold his arms and hold them very tight to his chest," which seemed to Trooper Bowles to be a "very defensive posture."  (Tr. at 32.)

Dispatch responded and informed Trooper Bowles that Mr. Bravo-Ortega's license was suspended.  (Tr. at 32.)  Accordingly, in addition to the warning for lane violation, Trooper Bowles also drafted a citation for driving on a suspended license.  Approximately fifteen minutes elapsed from the time Trooper Bowles initially stopped the Durango until he issued the warning and citation and returned Mr. Bravo-Ortega's documents.  (Tr. at 33.)  However, Mr. Bravo-Ortega was not free to leave.  (Tr. at 33.)  Trooper Bowles testified that, based on the

"indicators" he had observed up to that point, he "needed to look into the situation further and determine whether or not [Mr. Bravo-Ortega] was involved in criminal activity."  (Tr. at 33.)

Trooper Bowles testified that the following factors contributed to his reasonable suspicion of criminal activity.  The Durango initially appeared to be traveling with another vehicle and yet when Trooper Bowles began following the vehicles they tried to separate "as if they didn't want to be seen together," and Trooper Bowles was aware, from his experience, that drug traffickers often travel in tandem.  (Tr. at 34.)  After stopping the Durango, Trooper Bowles noticed that both front windows were rolled down even though it was early February and cold outside.  Trooper Bowles testified that he found this unusual and consistent with illegal activity. (Tr. at 34.)  Trooper Bowles also noticed that Mr. Bravo-Ortega had what he perceived to be excessive luggage for his brief stay in Las Vegas.  (Tr. at 34.)  Next, Trooper Bowles became increasingly concerned when Mr. Bravo-Ortega was not listed as a permitted driver on the rental contract, and the renter was not in the vehicle.  Similarly, although Mr. Bravo-Ortega claimed that the woman who rented the vehicle was his wife, he provided a different address than the woman who rented the vehicle.  (Tr. at 35.)  With regard to his travel plans, Trooper Bowles noted that Mr. Bravo-Ortega had traveled a very long distance for a very short stay in Las Vegas. According to Trooper Bowles, Las Vegas is known as a "major drug source," Denver is a major drug destination, and Interstate 70 is a well-known drug pipeline.  (Tr. at 14, 35.)  Finally, Trooper Bowles found it unusual that the reason for Mr. Bravo-Ortega's trip to Las Vegas was to visit his cousin who recently had a baby, yet he did not know the baby's name or gender, and he could not recall the specific location where he had stayed.  Trooper Bowles testified that given

these factors, and in light of his training and experience, he believed he had reasonable suspicion to "look into the matter further."  (Tr. at 35.)

In addition, Trooper Bowles testified that "at the very least" Mr. Bravo-Ortega was not free to leave because Trooper Bowles had decided to impound the vehicle based on Mr. Bravo-Ortega's suspended license and because he was not listed on the rental agreement.  (Tr. at 34.) When Trooper Bowles told Mr. Bravo-Ortega that he was going to impound the Durango, Mr. Bravo-Ortega made a second request to drive the vehicle into town.  (Tr. at 34.)

Trooper Bowles told Mr. Bravo he was "concerned about a few things and asked him if he was doing anything illegal," to which Mr. Bravo-Ortega responded he was not.  (Tr. at 35.) Trooper Bowles asked if he had any weapons or drugs in the vehicle, and Mr. Bravo said he did not.  (Tr. at 35.)  Trooper Bowles then asked for and was given consent to search the vehicle. (Tr. at 35, 36.)  During the search, Trooper Bowles discovered twenty three one-pound packages of what he suspected to be, and later field tested positive for, methamphetamine.  The methamphetamine was found in one of the duffle bags located on the second-row seat.  (Tr. at 36, 37.)  Trooper Bowles then arrested Mr. Bravo.  (Tr. at 37.)

After discovering the methamphetamine, Trooper Bowles asked dispatch to contact Trooper Wright and tell him "if he had a good feeling about his stop to escort the Buick back to Trooper Bowles' position."  (Ex. 1 at 17:44:58; Ex. 4 at 17:31:29.)  Dispatch made two unsuccessful attempts to contact Trooper Wright via his portable radio.  (Tr. at 90.)  Because dispatch had been unable to contact Trooper Wright, Trooper Bowles asked a local city police officer to go to Trooper Wright's location and tell him that methamphetamine had been found in

the Durango.  (Tr. at 77.)  Approximately ten minutes later Trooper Bowles proceeded to

Trooper Wright's location near milepost 62.  (Tr. at 37.)

            <u>The Stop, Detention and Arrest of Defendant Garcia</u>

            On the afternoon of February 6, 2007, Utah Highway Patrol Trooper Kevin Wright was

working on Interstate 70 just east of milepost 59 in Sevier County, Utah.  (Tr. at 64-65.)  While

Trooper Wright was parked in the median monitoring eastbound traffic, he received a call from

Trooper Bowles, who was traveling east on the Interstate and just passing Trooper Wright's

location.  (Tr. at 65.)  Trooper Bowles told Trooper Wright that he had observed two vehicles

driving eastbound that appeared to be traveling together, and when he pulled onto the Interstate

the second car "backed way off."  (Tr. at 65.)  Trooper Bowles told Trooper Wright that the

second vehicle was a tan passenger car, perhaps a Buick, with very dark window tint.  (Tr. at

66.)  Shortly after Trooper Bowles' call, Trooper Wright saw a tan Buick with very dark window

tint pass his location.  (Tr. at 66.)  Trooper Wright believed that the Buick's windows were in

violation of Utah Code Ann. § 41-6a-1635(1)(b), and he proceeded onto Interstate-70 to pursue

the Buick.  (Tr. at 67.)  While following the Buick, Trooper Wright saw Trooper Bowles stopped

on the side of the Interstate with the Durango driven by Mr. Bravo-Ortega.  (Tr. at 68.)

            Trooper Wright initiated a traffic stop of the Buick and approached the vehicle on the

passenger side.  Trooper Wright observed a male driver, who was the sole occupant, and he

asked the driver for his license, registration, and insurance information.  (Tr. at 69.)  Trooper

Wright conversed with the driver in English and the driver appeared to understand.  (Tr. at 70.)

The driver provided a Colorado driver's license in the name of Michael Garcia.  (Tr. at 70.)  Mr.

Garcia claimed the vehicle was his, but said he could not find the registration.  (Tr. at 72.)
Trooper Wright explained that he stopped Mr. Garcia for a window tint violation.

Trooper Wright asked Mr. Garcia about his travel plans.  (Tr. at 70-71.)  Mr. Garcia
stated that he had departed from Denver on Friday and was coming back from Las Vegas where
he had been visiting his daughter.  (Tr. at 71.)  When asked where he stayed in Las Vegas, Mr.
Garcia indicated the Tropicana Motel, and said his daughter lived on Tropicana Street.  (Tr. at
71, 83.)  During the course of this conversation, Trooper Wright was able to see inside the
vehicle.  Trooper Wright initially noticed that the dash compartment appeared to have been
previously removed and was not "factory standard."  (Tr. at 71.)  Trooper Wright also observed
several food wrappers and a bottle containing a yellow substance which appeared to be urine.
(Tr. at 72.)

Trooper Wright retrieved the light transmittance test equipment from his patrol car and
returned to the Buick to test the window tint.  (Tr. at 72-73.)  The test revealed that the
transmittance was only 13%, well below the legally required 43%.  (Tr. at 73-74.)  Trooper
Wright informed Mr. Garcia of the test results.  Thereafter, Trooper Wright returned to his patrol
car to run a check on the driver's license and license plate and to prepare a warning.   (Tr. at 74.)

After receiving the requested information from dispatch and filling out the appropriate
forms on his computer, Trooper Wright went back to the Buick and returned Mr. Garcia's
information.  Trooper Wright told Mr. Garcia that although he could have been issued a citation
for the window tint violation, he had decided to give him a warning.  Approximately fifteen
minutes elapsed from the time Trooper Wright stopped the vehicle until he returned Mr. Garcia's

information and gave him the warning.  (Tr. at 74.)

Throughout the traffic stop Trooper Wright became increasingly suspicious that Mr. Garcia might be transporting drugs.  (Tr. at 75.)  First, Trooper Wright had already been informed by Trooper Bowles that the Buick initially appeared to be traveling in tandem with the Durango, and that the vehicles attempted to distance themselves upon seeing Trooper Bowles.  Then, after stopping the Buick, Trooper Wright testified that he grew increasingly suspicious when Mr. Garcia could not produce the vehicle's registration because, according to Trooper Wright, individuals sometimes fail to produce this information "because they don't want to be identified."  (Tr. at 72.)  Additionally, Mr. Garcia had what appeared to be a bottle filled with urine in the vehicle.  Trooper Wright found the urine bottle unusual given that there are numerous services between Las Vegas and Richfield, and he was aware that "oftentimes individuals hauling contraband want to get from their source destination to where they are heading without stopping."  (Tr. at 72, 98.)  Moreover, Trooper Wright observed that the dash compartment of Mr. Garcia's vehicle appeared to have been previously "pried out" and from his experience he knew that contraband is frequently stored in that location.  (Tr. at 71.)  Trooper Wright considered this information in light of the short duration of Mr. Garcia's trip and the fact that he was traveling on Interstate-70, coming from Las Vegas, and heading to Denver.  (Tr. at 71, 75.)

Because of his concerns Trooper Wright asked Mr. Garcia if he was hauling drugs.  (Tr. at 76.)  Mr. Garcia said he was not.  Trooper Wright then asked for and was given consent to search the Buick.  (Tr. at 76.)  Trooper Wright began his search by asking Mr. Garcia to step out

of the vehicle.  He also asked Mr. Garcia to turn off the cell phone that was in his jacket pocket

and leave the phone in the car.  Mr. Garcia complied.  (Tr. at 76; Ex. 4 at 17:22:26.)  Trooper

Wright looked at the dashboard more closely and confirmed that it appeared to have been

tampered with or previously removed.  He also found that the back seat was loose and had been

"taken apart or lifted at one point."  (Tr. at 76.)  Trooper Wright also found an additional cell

phone near the center console.  (Tr. at 77.)  In the trunk, Trooper Wright found several loose

dryer sheets.  (Tr. at 76-77, 86.)

Approximately ten minutes into the search of Mr. Garcia's vehicle a local city police

officer arrived at Trooper Wright's location to relay the message that Trooper Bowles had found

"a pipeline load" in the Durango and he thought it was methamphetamine.  (Tr. at 77; Ex. 4 at

17:34:11.)  Trooper Wright continued the search of Mr. Garcia's Buick for eleven more minutes,

at which time Trooper Bowles arrived at Trooper Wright's location.  (Tr. at 77-78; Ex. 4 at

17:45:29.)

Upon Trooper Bowles' arrival, the troopers discussed how Mr. Garcia's dashboard

appeared to have been removed and the presence of dryer sheets in the trunk.  (Tr. at 39-40.)

Both troopers were aware that dryer sheets are "frequently used to package narcotics" in an

attempt to defeat the odor of drugs and prevent dogs from indicating on narcotics.  (Tr. at 40, 76-

77, 86.)  The troopers also discussed the significance of Mr. Garcia's two cell phones, noting that

drug organizations often provide a second phone to someone who is transporting narcotics so

they have a reliable contact number for the courier.  (Tr. at 40.)  Trooper Bowles testified that in

his experience "most times the subject that has the phone does not know anything about the

phone and doesn't know the phone number for it." (Tr. at 40.)  And, consistent with Trooper

Bowles' experience, Mr. Garcia was unable to provide a number for one of the cell phones he

possessed.  (Tr. at 40.)  The troopers also noted that Mr. Garcia had no clothing bags or luggage

whatsoever in his vehicle.  (Tr. at 39.)

Additionally, Troopers Bowles and Wright discussed the similarities between the two

traffic stops.  Specifically, they discussed how the Durango and Buick were initially traveling in

very close proximity and then attempted to distance themselves when Trooper Bowles pulled

onto the highway behind them.  The troopers also noted that both vehicles contained a lone, male

driver in his mid-twenties, and both were from Denver.  In addition, both men were traveling

back not simply from Las Vegas, but from the same specific vicinity of "Tropicana Street."

Moreover, both men reported that they had been visiting relatives on Tropicana, and both were

returning to Denver at the same time.  (Tr. at 39.)  In light of these factors, the troopers believed

that Mr. Bravo-Ortega and Mr. Garcia were traveling together and they decided to detain Mr.

Garcia for further investigation.  (Tr. at 40, 78.)

Trooper Wright handcuffed Mr. Garcia and placed Mr. Garcia in his patrol car.  (Tr. at

78, 88.)  The troopers told Mr. Garcia that he was not under arrest, but that he was being

detained for further investigation.  (Tr. at 78.)  Thereafter, Mr. Garcia was transported

approximately twenty miles to the Sheriff's Office in Richfield, Utah.  (Tr. at 78, 89.)

On August 30, 2007, Mr. Bravo-Ortega and Mr. Garcia were charged in a one-count

indictment with possession with intent to distribute fifty grams or more of methamphetamine,

and aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Mr.

13

Bravo-Ortega and Mr. Garcia have each filed a motion to suppress the evidence obtained as a result of the two separate traffic stops that occurred on February 6, 2007.  (Dkt. Nos. 11 & 20.) Mr. Bravo-Ortega contests only the legality of the stop of his vehicle, asserting that "the government simply has not met its burden of proving the reasonableness of the officer's suspicion supporting the stop."  <u>See</u> Def. Bravo-Ortega's Mem. In Supp. at 1.  Mr. Garcia, on the other hand, contests only his arrest.  He claims that following the search of his vehicle, which yielded no contraband, the troopers lacked the requisite probable cause to arrest him and transport him to Richfield.  <u>See</u> Def. Garcia's Mem. In Supp. at 5.

<strong><u>DISCUSSION</u></strong>

### I.  The Traffic Stop of Defendant Bravo-Ortega

Mr. Bravo-Ortega's motion to suppress challenges only the initial stop of his vehicle.  He asserts that "Trooper Bowles had no objectively reasonable basis to think" that he had committed a traffic violation, and therefore the initial stop of the vehicle violated the Fourth Amendment. (Def. Bravo-Ortega's Mem. In Supp. at 13.)

A traffic stop is a "seizure" within the meaning of the Fourth Amendment, and as such, must be reasonable under the circumstances.  <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>United States v. Worthon</u>, 520 F.3d 1173, 1179 (10th Cir. 2008).   A traffic stop is reasonable at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred, <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996), or (2) a reasonable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction," <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787-88 (10th Cir.

14

1995) (en banc), cert. denied, 518 U.S. 1007 (1996).  It is irrelevant whether the particular

officer would have stopped the vehicle under general practices of the police department or

whether the officer may have had other subjective motives for stopping the vehicle.  United

States v. McRae, 81 F.3d 1528, 1533 (10th Cir. 1996).

In this case, Trooper Bowles testified that he stopped Mr. Bravo-Ortega because he failed

to keep the Durango within a single lane of traffic as required by Utah Code Ann. § 41-6a-

710(1).  That statute provides: "A person operating a vehicle shall keep the vehicle as nearly as

practical entirely within a single lane; and may not move the vehicle from the lane until the

operator has determined the movement can be made safely."  Id.  The United States Court of

Appeals for the Tenth Circuit has, on repeated occasion, addressed the validity of traffic stops

pursuant to this Utah statute as well as similarly-worded statutes from various other states within

the circuit.[3]   In so doing, the Tenth Circuit has explained:

> When an officer merely observes someone drive a vehicle outside the marked lane he
> does not automatically have probable cause to stop that person for a traffic violation.  The
> use of the phrase 'as nearly as practicable' in the statute precludes such absolute
> standards, and requires a fact-specific inquiry to assess whether an officer has probable
> cause to believe a violation has occurred.

United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999) (providing either probable cause or

reasonable suspicion is sufficient to support a traffic stop).  Accordingly, to determine whether a

---

[3] See, e.g., United States v. Valenzuela, 494 F.3d 886 (10th Cir. 2007) (upholding traffic
stop pursuant to Colorado statute which provides vehicle "shall be driven as nearly as practicable
within a single lane"); United States v. Alvarado, 430 F.3d 1305 (10th Cir. 2005) (upholding stop
of vehicle under Utah statute which provides driver shall "keep the vehicle as nearly as practical
entirely within a single lane"); United States v. Cline 349 F.3d 1276 (10th Cir. 2003) (upholding
stop of vehicle under Kansas statute using "as nearly as practicable" language); United States v.
Manjarrez, 348 F.3d 887 (10th Cir. 2003) (upholding stop of vehicle under Oklahoma statute
using "as nearly as practicable" language).

traffic stop made pursuant to this statute is reasonable under the Fourth Amendment the court must conduct a "fact-specific inquiry into the particular circumstances present during the incident in question in order to determine whether the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway."  United States v. Alverado, 430 F.3d 1305, 1309 (10th Cir. 2005).

In making this fact-specific assessment, the Tenth Circuit has repeatedly considered whether there were road, weather, or traffic conditions that made it impractical for the defendant to prevent his car from drifting out of its lane of travel.   For example, in United States v. Gregory, 79 F.3d 973 (10th Cir. 1996), the Tenth Circuit found that a traffic stop, made pursuant to this statute, was unreasonable where a vehicle pulling a U-haul, crossed over into the emergency lane only once, in mountainous terrain, on a winding road, and in windy weather.  Id. at 978.  The Tenth Circuit reasoned that "under these conditions any vehicle could be subject to an isolated incident of moving onto the right shoulder of the roadway, without giving rise to suspicion of criminal activity."  Id.  By way of comparison, in United States v. Alverado, 430 F.3d 1305 (10th Cir. 2005), the Tenth Circuit upheld the validity of a traffic stop pursuant to this same statute, where the vehicle crossed the fog line only once, but did so in the absence of any weather, road or other conditions that could have interfered with the driver's ability to keep the vehicle within a single lane.  Id.  Similarly in United States v. Ozbirn, 189 F.3d 1194 (10th Cir. 1999), the Tenth Circuit found a traffic stop "reasonable" where "no adverse physical conditions existed" and the driver of a motor home drifted onto the shoulder twice within a quarter mile.  Id. at 1198 (applying Kansas statute).

Turning to the facts of this case, the record indicates that on the day and time when Trooper Bowles stopped Mr. Bravo-Ortega there were "no bad conditions."  (Tr. at 15-16.)  It was daylight with partly cloudy skies.  The traffic in the area was light and the visibility down the highway was approximately one-half mile.  The roadway was relatively straight, dry and clear.  (Tr. at 15-16.)  Under these conditions, Trooper Bowles observed what appeared to be two vehicles traveling together and he began following them.  While attempting to catch up with the vehicles, Trooper Bowles observed the Durango's entire left tire cross over the center line by a few inches.  Trooper Bowles proceeded to catch up with the Durango, coming close enough to read the license plate, and then relayed the information to dispatch.  After doing this, Trooper Bowles "backed off" the vehicle, at which time he observed the Durango cross the center line two additional times within a relatively short distance.  Given these facts, and applying the well-established principles set forth by the Tenth Circuit, the court concludes that Trooper Bowles had reasonable suspicion that Mr. Bravo-Ortega violated § 41-6a-710(1) when he observed the Durango drift across the center line three times within approximately one-half mile under unremarkable road, weather and traffic conditions.  See Ozbirn, 189 F.3d at 1198 (upholding traffic stop as reasonable where there was nothing in the surrounding circumstances that would have prevented the driver from keeping the vehicle within the lane of travel).

Defense counsel suggests, however, that despite the foregoing, the traffic stop should be found invalid because it was police induced.  Def. Bravo-Ortega's Mem. In Supp. at 10-12; Tr. of Oral Argument at 22.   In that regard, counsel for Mr. Bravo-Ortega argues that Trooper Bowles' own conduct – following the Durango on the Interstate for several miles – may have

caused the driver to panic, contributing to the lane drift and thereby rendering the stop of the vehicle unreasonable.  Def. Bravo-Ortega's Mem. In Supp. at 10-12.  Although the court was initially somewhat inclined to agree, in light of the well-settled precedent in the Tenth Circuit, and given the specific facts in this case, the court rejects this argument.

First, while defense counsel generally argues that it is reasonable to believe a person might "have an instinct to panic" when followed by a trooper, and it might cause the individual to "try[] to see what this car is doing behind him," there is nothing in the record to show that the defendant in this case was, in fact, so distracted.  See United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003) (finding it significant that "despite defendant's suggestion that the officers may have contributed to his lane violation by following him, the district court found that 'there is no convincing evidence that this occurred here'").  The evidence in this case is void of any facts which would indicate that Mr. Bravo-Ortega drifted outside his lane, repeatedly, because he panicked, was looking at the trooper in his rear-view mirror, or was otherwise trying to ascertain Trooper Bowles' intentions.

More importantly, however, even if there was evidence before the court to show that Mr. Bravo-Ortega failed to stay in his lane of travel because he was distracted by Trooper Bowles' presence, the court would not reach a different conclusion.  With the law being as settled as it is in the Tenth Circuit, this court declines to carve out a difficult to define category or exception for an alleged police induced traffic violation where the officer has done nothing more than follow the vehicle along a public interstate.  Given that virtually every traffic stop involves some level of officer pursuit or observation, this court is of the opinion that the mere presence of an officer,

performing routine duties on the highway, is not the type of "road or traffic condition" contemplated by Tenth Circuit precedent that would excuse or justify a lane violation.[4]   The law is what it is, and motorists are simply required to comply with the traffic laws, even if they are particularly nervous because they are transporting large quantities of narcotics.   See, e.g., United States v. Worthon, 520 F.3d 1173 (10th Cir. 2008) (concluding that stop of defendant's vehicle for following too closely to the officer's car was reasonable even though the officer's own conduct – slowing down in front of the defendant's vehicle – was "perhaps a 'but for' cause" of defendant's traffic violation because the defendant "could and should have" slowed down to maintain a safe distance).

        In sum, under the particular facts of this case, where the record is entirely void of any weather conditions, road features or other circumstances that could have interfered with Mr. Bravo-Ortega's ability to keep his vehicle in a single lane, and where the only suggested condition which might possibly have contributed to the lane violations was Trooper Bowles' presence behind Mr. Bravo-Ortega on the highway, the court finds that Trooper Bowles had a reasonable, articulable suspicion that Mr. Bravo-Ortega violated Utah Code Ann. § 41-6a-710(1)

_____

        [4]In fact, the Tenth Circuit previously reached a similar conclusion, albeit in an unpublished opinion.  In United States v. Kerr, 35 Fed. Appx. 728 (10th Cir. April 18, 2002) (unpublished), the Tenth Circuit accepted the district court's finding that "nothing in the evidence suggests that the conditions . . . would have made it impracticable to maintain a single lane," despite the defendant's explicit testimony that "he had been acutely aware of the troopers' presence behind him on the highway, that the officers' presence made him extremely nervous, and that he frequently checked the patrol car in his rear-view mirrors."  The Tenth Circuit determined that "because defendant only asserts that 'he might have drifted because he was looking in his mirror at the troopers' but does not contend anything more than the mere presence of the troopers contributed to his lane drifting," the stop of the vehicle was reasonable.  Id. at 731.

by crossing over the center line on three separate occasions.  Accordingly, the traffic stop of Mr. Bravo-Ortega's vehicle was reasonable under the Fourth Amendment.

## II.  The Arrest of Defendant Garcia

Mr. Garcia does not challenge the stop, detention, or search of the Buick.  Rather, Mr. Garcia claims that following the search, when he was handcuffed, placed in the patrol car and then transported to the Sheriff's Office in Richfield, he was effectively arrested without probable cause in violation of the Fourth Amendment.  Def. Garcia's Mem. In Supp. at 5.  Although both troopers testified that in their opinion Mr. Garcia was merely being "detained," the court agrees that the troopers' conduct following the search – handcuffing Mr. Garcia roadside and then transporting him twenty miles to the Sheriff's Office – was the functional equivalent of an arrest. See United States v. Valenzuela, 365 F.3d 892, 895-96 (10th Cir. 2004) (providing that an arrest is characterized by highly intrusive or lengthy search or detention, and must be supported by probable cause); see also Kaupp v. Texas, 538 U.S. 626 (2003) (providing that the involuntary transport of an individual to a police station for questioning is sufficiently like an arrest to require probable cause); United States v. Shareef, 100 F.3d 1491, 1508(10th Cir. 1996) ("Transportation of a defendant to the police station cannot be justified absent probable cause to believe the defendant committed a crime.").  Having determined that Mr. Garcia was arrested following the search of his vehicle, the court must determine whether the arrest was supported by probable cause.

"An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a

reasonable person to believe that an offense has been or is being committed by the person

arrested." United States v. Munoz-Nava, 524 F.3d 1137, 1144 (10th Cir. 2008) (quoting United

States v. Brooks, 438 F.3d 1231, 1241 (10th Cir. 2006)).  It is measured against an objective

standard of reasonableness and may rest on the collective knowledge of all officers involved in

an investigation rather than solely on the knowledge of the officer who made the arrest.  United

States v. Zamudio-Carrillo, 499 F.3d 1206, 1209 (10th Cir. 2007); United States v. Merritt, 695

F.2d 1263, 1268 (10th Cir. 1982).  "Probable cause to arrest does not require facts sufficient to

establish guilt, but does require more than mere suspicion."  United States v. Vazquez-Pulido,

155 F.3d 1213, 1216 (10th Cir.), cert. denied, 525 U.S. 978 (1998).

In assessing probable cause, "courts may not engage in a 'divide-and-conquer' analysis

of facts."  Valenzuela, 365 F.3d at 897.  The court must not look at the factors in isolation, but

instead must consider the totality of the circumstances to determine whether rational inferences

can be drawn from the facts to support probable cause.  Munoz-Nava, 524 F.3d at 1144.

Moreover, simply because an activity has an innocent connotation does not mean that it is

excluded from the court's totality of the circumstances analysis.  Id. (quoting Illinois v. Gates,

462 U.S. 213, 244 n.13 (1983)).  "Even if a factor 'is not by itself proof of any illegal conduct

and is quite consistent with innocent travel,' it may still contribute to establishing probable

cause."  Id. at 1145 (quoting United States v. Sokolow, 490 U.S. 1, 9 (1989)).

Applying these principles to the facts in this case, the court finds that the troopers

reasonably inferred a connection between Mr. Garcia and Mr. Bravo-Ortega (and therefore the

methamphetamine found in the Durango), and that the totality of the circumstances supported a

finding of probable cause to arrest Mr. Garcia.  First, Trooper Bowles testified that when he first

saw the Buick and the Durango, he believed they were traveling together because they were

traveling in such close proximity (within a car length) and "there was not any other traffic

around."  (Tr. at 17, 43.)  In addition, Trooper Bowles observed that both vehicles had Colorado

license plates and both vehicles contained an unaccompanied male driver who appeared to be in

his mid-twenties.  (Tr. at 17, 42, 43.)  Trooper Bowles testified that "both vehicles appeared to

slow when they observed" him, and then when he pulled onto the highway the second car

"backed way off," and the vehicles "really separated as if they didn't want to be seen together."

(Tr. at 17, 34, 65.)

   Thereafter, when Trooper Wright stopped the Buick, he encountered a driver who,

although claiming to own the vehicle, was unable to produce the registration documents.  The

inability to produce the vehicle's registration immediately concerned Trooper Wright.  (Tr. at

72.)  See United States v. Villa-Chaparo, 115 F.3d 797, 802 (10th Cir. 1997) (providing that

driver's inability to provide proof he is entitled to operate vehicle is a recurring factor finding

reasonable suspicion of criminal activity).  At this same time, Trooper Wright observed several

food wrappers and a bottle containing what appeared to be urine.  Trooper Wright found the

urine bottle very suspicious given the availability of services between Las Vegas and Richfield,

and he also knew that individuals hauling contraband often want to get to their destination

without stopping.  (Tr. at 72.)  Similarly, Trooper Wright found it unusual that although Mr.

Garcia claimed to have been on a vacation to Las Vegas, he did not have a single piece of

luggage.  (Tr. at 39.)

Moreover, during the course of the stop the troopers noted several unusual features within the Buick which suggested that the vehicle might have been involved in drug trafficking. Trooper Wright observed that the front dashboard appeared to have been "pried out" or previously removed, and he was aware that contraband can be and is frequently stored in that location.  In addition, Trooper Wright observed that the rear seat had been "taken apart or lifted at one point," and he found several loose dryer sheets in the trunk, which are often used to mask the scent of drugs.  (Tr. at 76-77).  The troopers also found two cell phones inside the Buick, and Mr. Garcia did not know the phone number for one of them.  Based on their experience, the troopers were aware that drug trafficking organizations often provide a second phone for a courier in order to have a reliable contact number, but typically the courier will not know anything about the phone, including the phone number.  (Tr. at 40.)

In addition to these factors, the troopers also discussed the notable similarities between Mr. Garcia and Mr. Bravo-Ortega's travels.  Although Mr. Garcia and Mr. Bravo-Ortega were interviewed separately, at different times and different locations, both drivers provided remarkably similar travel plans.  Both drivers reported that they had departed from Denver, Colorado and made a brief trip to Las Vegas, Nevada.  Both men reported that they had stayed in the specific vicinity of "Tropicana Street," however, neither could provide an address or give directions to the location they had visited.  Additionally, both men reported that the reason for the trip was to visit relatives, and both men were returning to Denver at the same time.

In light of the foregoing, the court finds that given the totality of the circumstances, the troopers could reasonably infer that Mr. Garcia and Mr. Bravo-Ortega were traveling together,

and based on that inference Trooper Wright had probable cause to believe that Mr. Garcia had or

was committing an offense.  See United States v. Munoz-Nava, 524 F.3d 1137, 1144 (10th Cir.

2008) (providing court must consider the totality of the circumstances to determine whether

rational inferences can be drawn from the facts to support probable cause).  Accordingly, the

court concludes that Mr. Garcia's arrest did not violate the Fourth Amendment.

## CONCLUSION

Having determined that Trooper Bowles' traffic stop of Mr. Bravo-Ortega was supported

by a reasonable, articulable suspicion that Mr. Bravo-Ortega committed a traffic violation, Mr.

Bravo-Ortega's motion to suppress is DENIED.  Similarly, having concluded that Trooper

Wright had probable cause to arrest Mr. Garcia following the search of his vehicle, Mr. Garcia's

motion to suppress is DENIED.

IT IS SO ORDERED.

Dated this 6th day of October, 2008.

_____
Dee Benson
United States District Judge